**NEW YORK LIFE INSURANCE COMPANY, Plaintiff-Appellee,**

v.

**Noel B. BAUM and Media Sales and Marketing, Inc., Defendants-Appellants.**

**No. 82–2086.**

United States Court of Appeals, Fifth Circuit.

Feb. 14, 1983.

929

Robin C. Gibbs, Debora Ratliff, Houston, Tex., for Baum.

John A. Bailey, Tara L. Wall, Houston, Tex., for Media Sales & Marketing, Inc.

Baker & Botts, Richard L. Josephson, Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, THORN-BERRY and POLITZ, Circuit Judges.

THORNBERRY, Circuit Judge:

I. *Introduction:*

This is the second appeal following our remand to the district court in 617 F.2d 1201, 1205. On remand, the district court held that under the conflict of laws rules of Texas, Louisiana law applied. The court then concluded that under Louisiana law, neither Baum nor Media Texas had an insurable interest in the life of Cook, and that the life insurance policy was consequently void from the outset. After reexamining the record as a whole, we conclude that the

district court erred as a matter of law in applying the law of Louisiana. Furthermore, we hold that Texas conflict of laws rules mandate that New York law be applied in this case, and that under New York law, Baum had an insurable interest in the life of Cook. We therefore vacate the judgment of the district court and render judgment for Baum.

## II. *Facts and Disposition Below:*

We need not repeat here the facts of this case. *See New York Life Insurance Co. v. Baum,* 617 F.2d 1201, 1201–03 (5th Cir. 1980). On remand, the district court issued two memoranda and orders in which it made several findings of fact. On May 15, 1981, the district court issued its first memorandum, holding that Louisiana substantive law controlled the insurance contract in the present action. The court based this conclusion on its determination that Texas law required that where a contract is made in one state, but is to be performed in more than one place, the law of the place of the making of the contract presumptively controls its substantive interpretation. The court then stated that

> [p]erformance, in the case of a life insurance contract, entails both payment of premiums by the policy owner and the payment of proceeds by the insurer. The contract in this case, specifically named New York as the place for premium payment. However, as with all life insurance contracts, the place of the payment of proceeds was uncertain. In this case, Mr. Cook was killed in Texas and both a Louisiana resident, Mr. Baum, and a Texas corporation are seeking payment of the proceeds. Therefore, performance in this case was anticipated and took place in more than one jurisdiction and the Court must follow the initial presumption that the law of the state where the contract was made governs. This Court finds that since Louisiana is the place where the contract was made, Texas law presumes that the parties to the contract intended for Louisiana law to govern. . . .

Following further proceedings, the court, on January 25, 1982, issued its second memorandum, and held that La.Rev.Stat.Ann. § 22:613 A (West) controlled construction of the policy here. That statute requires that a third party taking out an insurance policy on the life of another and paying the premiums have an insurable interest in the continuation of the life of the insured. The court held that neither Baum nor Media Texas had an interest in the continuation of Cook's life. The court noted that since Media Texas was nothing more than a nonfunctioning corporate shell that was not even incorporated at the time the insurance policy took effect, it "could not have an expectation of substantial economic interest in the continuation of Mr. Cook's life." Regarding Baum, the court first admitted that Baum had "a superficially stronger argument [than did Media Texas] since he made a financial investment in the ill-fated business venture." However, since the enterprise was a financial failure, the court concluded that any hope of some future benefits was unwarranted optimism, and not sufficient to create an insurable interest. The court next noted the disproportionality of Baum's investment in the business venture to the face amount of the insurance policy (a $16,000 investment as compared to proceeds of $50,000 or $100,000). The court concluded in light of these factors that the "situation fostered an interest in Cook's death." Finally, the court stated that even if the policy was taken out with Cook's full knowledge and participation, Baum still did not qualify on these facts as a party with an insurable interest in the life of Cook. The court accordingly granted New York Life's motion for summary judgment, though it ordered it to reimburse Baum the insurance premiums he paid on the contract.

## III. *Analysis:*

### A. Conflict of Laws

We begin by outlining once again the conflict of law rules that control in this case. As a Court of Appeals sitting in diversity we must, of course, apply the

choice of law rules of the forum state, in this case Texas. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

Under Texas law, in the absence of a contrary manifestation, an initial presumption is that the parties intend for the law of the jurisdiction where the contract is made to govern. *Dailey v. Transitron Electronic Corp.*, 475 F.2d 12 (5th Cir.1973); *Austin Building Co. v. National Union Fire Ins. Co.*, 432 S.W.2d 697 (Tex.1968); *Fidelity Mut. Life Ass'n v. Harris*, 94 Tex. 25, 57 S.W. 635 (1900). However, where the contract is made in one jurisdiction but to be performed in another the presumption arises that the parties contracted with reference to the place of performance. *Ramirez v. Autobuses Blancos Flecha Roja, S.A. De C.V.*, 486 F.2d 493 (5th Cir.1973); *Castilleja v. Camero*, 414 S.W.2d 424 (Tex.1967); *Frey v. Estate of Sargent*, 533 S.W.2d 142 (Tex.Civ.App.1976); *Harris, supra.*

*Baum,* 617 F.2d at 1204.

"Where the contract was made in one state but was to be performed in that and partly in another state, the court has ordinarily determined the validity of the contract by the law of the place where the contract was made." *Grace v. Orkin Exterminating Co.*, 255 S.W.2d 279, 294 (Tex.Civ. App.—Beaumont 1953, writ ref'd n.r.e.); *Ramirez v. Autobuses Blancos Flecha Roja, S.A. De C.V.*, 486 F.2d 493, 496 (5th Cir. 1973).

■ However, Texas courts have also held that incidental performance in one state would not preclude the application of the law of the state where the bulk of performance occurred, and in which the contract itself was made. *Chicago R.I. & P.R. Co. v. Thompson*, 100 Tex. 185, 97 S.W. 459, 460 (1906). In *Grace v. Orkin Exterminating Co., supra*, the court further expanded this rule to encompass those situations in which performance in a foreign jurisdiction was more than merely incidental to the main performance. 255 S.W.2d at 296. The rule seems settled today that "[w]here most of the performance of the agreement occurs in Texas, the agreement will be covered by the laws of Texas." *Smith v. Bidwell*, 619 S.W.2d 445, 449 (Tex.Civ.App.— Corpus Christi 1981, writ ref'd n.r.e.).

■ Analysis of Texas cases involving insurance contracts yields a number of rules upon which courts may rely in determining the place of the making of the contract and its performance. In *Seiders v. Merchants' Life Ass'n of the United States*, 93 Tex. 194, 54 S.W. 753 (1900), the Supreme Court of Texas held that where an insurance contract provided that the principal and premiums be paid in an insurance company's home office in Missouri, even though the contract was actually made in Texas, Missouri law controlled construction of the contract in the absence of any special circumstances:

Conceding that the contract of insurance was made in Texas, it is made payable at the home office, in the state of Missouri, and all premiums are likewise made payable there. It does not provide for any act to be done elsewhere by the company. A tender of the money at the home office would have been valid. Unless there be something in the circumstances which indicate that the parties contracted with reference to the laws of Texas, the legal effect of the contract must be determined according to the laws of the state of Missouri.

54 S.W. at 754.[1]

■ In *Fidelity Mutual Life Ass'n v. Harris*, 94 Tex. 25, 57 S.W. 635 (1900), the court emphasized the applicability of contract offer and acceptance principles to the determination of the place of the making

---

1. Later in the opinion, the court formulated the following rule governing the construction of insurance contracts:

It is a well-established rule of construction applied to this character of contracts that courts will construe them so as to prevent a forfeiture of the rights of the insured, if it can be done consistently with the terms of the policy and the law, and in case of doubt the contract will be construed most strongly against the insurance company.
54 S.W. at 755.

and performance of a life insurance contract:

> The test is generally held to be the acquiescence or final agreement of minds by which the contract is concluded, and the place where that occurs is the place where the contract, for most purposes, is held to have been made. With reference to contracts of insurance, where applications or proposals are taken in one state by an agent having no authority to conclude the contract or bind the company, and are forwarded to the domicile of the company, and there accepted, and the policy issued, the contract is ordinarily to be treated as having been made at such domicile, and to be performed there. Whart.Confl.Laws, § 465; Bliss, Inc. § 362; May, Ins. § 66, and cases cited. This is true, however, only because the act of the company in signifying its acceptance of the proposal completes the contract; and when, as sometimes happens, other things are to be done before the parties are to be bound, the contract is held to have been made when and where such other things transpired. It is often stipulated in policies that they are not to take effect until the first premium has been paid, and the policy has been countersigned by the agent of the company in the place where the applicant resides; and it is held that the contract is to be considered as made where these acts are done.

57 S.W. at 638. The court then distinguished acts of delivering the policy to the insured by the local agents:

> The general rule is that the acceptance of the application and the issuance and mailing of the policy are all the acts that are essential to put the contract in force; and the fact that the policy is sent to an agent for unconditional delivery does not alter the effect of the transaction.

*Id.* at 639. Thus, it is clear that, under Texas law, where an agent must verify to his satisfaction a certain condition of the insured prior to delivering the insurance contract, the final act of the making of the contract occurs at the place where the insured resides. However, where delivery of the policy is unconditional, the contract is deemed to have been made at the domicile of the insurance company. *Accord Metropolitan Life Ins. Co. v. Bradley,* 98 Tex. 230, 82 S.W. 1031, 1032 (1904).

The principles outlined in *Seiders* and *Fidelity* are still applicable today. *Castilleja v. Camero,* 414 S.W.2d 424, 426 (Tex.1967); *Baum, supra,* 617 F.2d at 1204. Thus, in *Mutual Life Insurance of New York v. Anderson,* 408 S.W.2d 335 (Tex.Civ.App.—Dallas 1966, writ ref'd n.r.e.), the policy was sent to the insurance company's regional office to be held "pending the completion of the investigation by the home office as to whether [the insurance company] was satisfied that [the insured] was acceptable as an insurance risk under the company's standards." 408 S.W.2d at 340. The court held that where, by the terms of the application for an insurance policy, delivery of the policy was made a condition precedent to inception of the policy, and the policy was never delivered to the applicant, the contract of insurance had not been consummated. *Id.* In *American Nat. Ins. Co. v. Smith,* 13 S.W.2d 720 (Tex.Civ.App.—El Paso 1929, writ ref'd), the insurance policy contained the following delivery clause: "Deliver no policy without seeing the policyholder and satisfying yourself that the risk is in sound health. If appearance is not satisfactory, send the policy back to the Company, stating the cause and await further instructions." The court had no trouble concluding that an undelivered policy did not constitute an effective contract, and that the validity of the contract was to be determined by the place of delivery. 13 S.W.2d at 722.

■ Applying these principles to our case, we conclude that the contract was made in New York, and was to be substantially performed in that state. The insurance contract contains the following provisions:

1. THE CONTRACT

. . . . .

Only the President, Executive Vice-President, Vice President, Treasurer or

Secretary of the Company at its Home Office can make or modify this contract or waive any of the Company's rights or requirements.

All payments by the Company under this policy are payable at the Company's Home Office in New York City.

. . . . .

### 4. PAYMENT OF PREMIUMS

Premiums are payable during the Insured's lifetime in accordance with the Premium Schedule, in exchange for a receipt signed by the President or Secretary of the Company and duly countersigned. . . .

After payment of the first premium, failure to pay a premium on or before its due date, to the Company at its Home Office or to a duly authorized Office Manager of the Company, will constitute default in payment of premium.

Under the principles outlined above, we conclude that the contract was made in New York. The acceptance of the application and the issuance and mailing of the policy, acts that were essential to the consummation of the contract, occurred in New York. While it is true that the application stipulated that "no policy applied for herein shall go into force or take effect unless and until it is delivered to the applicant," we are inclined to view this provision much as the Texas Supreme Court viewed a similar provision in *Fidelity, supra,* 57 S.W. at 638. Stated differently, the fact that the policy is sent to an agent for unconditional delivery does not alter the effect of the transaction, which was consummated at the New York headquarters of the Company. *Id.* at 639.

■ Our holding that New York law controls the substantive outcome of this case is supported by the fact that, under Texas law, most of the performance of the contract would take place in New York. Thus, the premiums were to be paid to the Company or its agents in exchange for a receipt signed by the President of the Company or its Secretary in New York. All the essential documents entitling the beneficiary to payment were to be presented in New York, and all payments under the policy are payable in New York. *See Fidelity,* 57 S.W. at 639; *Seiders,* 54 S.W. at 754.

■ The district court, relying on Tex. Ins.Code Ann. art. 21.42 (Vernon 1963), believed that a hard and fast "home office" rule had been rejected by the State of Texas, and that the rules laid out in *Fidelity* and *Seiders* were no longer applicable as a result. Article 21.42 provides that the laws of Texas govern "[a]ny contract of insurance payable to any citizen or inhabitant of this State," where the insurer is doing business in Texas. We conclude that art. 21.42 does not apply to the policy which forms the basis of this suit. First, in order to apply the statute, we must determine the very issue which application of the statute is intended to resolve. The fundamental dispute between two of the parties in this case is over the identity of the beneficiary of this policy. Based on the available record, we cannot determine if the policy here is a "contract of insurance payable to any citizen or inhabitant of [Texas]" without first deciding who the beneficiary is. Furthermore, the original named beneficiary was Baum, a Louisiana resident. The beneficiary was later changed to Media Sales and Marketing, Inc. at the insistence of New York Life· because of its strict policy against having its own agents named beneficiaries on its insurance policies. Finally, art. 21.42 has been interpreted to apply "*when and only when* [the life insurance contracts] are made in the course of the [insurance] Company's Texas business." *Howell v. American Life Stock Insurance Co.,* 483 F.2d 1354, 1359 (5th Cir.1973) (emphasis in original) (citing *Austin Building Co. v. National Union Fire Ins. Co.,* 432 S.W.2d 697 (Tex.1968). *See Butler v. Mutual Life Assur. Co. of Canada,* 600 F.2d 532, 534 (5th Cir.1979). The evidence shows that the application for insurance was signed in Louisiana. Cook's physical examination was conducted in Louisiana, and the policy was issued and executed in New York. In light of the above, we conclude that the insurance contract was not made in the course of New York Life's business in Tex-

as, and hold that art. 21.42 has no bearing on this insurance policy.

### B. Insurable Interest Under New York Law

N.Y.Ins.Law § 146 (McKinney 1966) defines an insurable interest in the person. The statute, derived from a 1909 law and enacted in 1939, is remarkably similar to its Louisiana analogue, La.Stat.Ann. § 22:613 A (West). Section 146 defines an insurable interest in the case of persons not related by blood or by law as follows:

> [I]n the case of other persons, a lawful and substantial economic interest in having the life, health or bodily safety of the person insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury, as the case may be, of the person insured.

Section 146(2)(b).

"It may be generally stated that the reasoning behind legislation requiring an insurable interest ... is in furtherance of the public policy against wagering or gambling on human lives. This policy has been adopted in most jurisdictions to prevent speculation in human life, since the incentive to shorten the life of the insured would be increased." *Holmes v. Nationwide Mutual Ins. Co.,* 40 Misc.2d 894, 244 N.Y.S.2d 148, 150–51 (1963), *aff'd,* 19 A.D.2d 947, 245 N.Y.S.2d 330 (1963). While discussing the subject of insurable interest between creditors and their debtors another New York court held as follows:

> It is now well settled that the bank had an insurable interest in the life of the plaintiff's intestate at the time it made the loan to him and under such circumstances the bank had the right to enter into any agreement with the insurance company so that it would receive a sum of money as indemnity in case its interest in the subject matter should suffer diminution of value by reason of certain specified causes or contingencies. 1 May on Insurance (4th Ed. Sec. 6). The bank with such an insurable interest in the borrower clearly had the right to secure itself against the death of the borrower.

*Alperstein v. National City Bank of New York,* 201 Misc. 47, 103 N.Y.S.2d 930, 934–35 (1951). *See also Walker v. Walbridge,* 151 Misc. 329, 271 N.Y.S. 473, 481 (1934) ("It may be stated generally, however, to be such an [insurable] interest, arising from the relations of the party obtaining the insurance, either as *creditor* of or surety for the assured ... as will justify a reasonable expectation of advantage or benefit from the continuance of his life.") (quoting *Warnock v. Davis,* 104 U.S. 775, 779, 26 L.Ed. 924 (1892)) (emphasis added); *Talbert v. Storum,* 7 A.D. 456, 39 N.Y.S. 1047 (1896) (a creditor has an insurable interest in the life of his debtor). The *Alperstein* court, *supra,* went so far as to hold that "[a] creditor whose debt has been paid after he has obtained a policy on the life of his debtor may still recover [the proceeds from a life insurance contract]." 103 N.Y.S.2d at 937 (quoting *Empire Dev. Co. v. Title Guarantee & Trust Co.,* 225 N.Y. 53, 58, 121 N.E. 468, 469 (N.Y.1918)). *See generally,* 2 J. Appleman, Insurance Law and Practice §§ 761, 762, 851–52 (1941).

■ Applying these principles to our case, we hold that, under New York law, Baum had an insurable interest in the life of Cook, his debtor, as a matter of law. A creditor-debtor relationship existed between Baum and Cook at the time the policy was executed and Baum loaned the majority of the funds to Cook *after* the policy went into effect. The facts fail to show that the policy was taken as a wager. As creditor, Baum had a reasonable ground to expect some benefit or advantage from the continuation of Cook's life, namely, repayment of the loan. Furthermore, there are compelling arguments against allowing the insurer to escape its obligation.

> It is surely not a sound policy to permit insurers to contract to insure the lives of persons, receive premiums therefor as long as the * * * beneficiary * * * will continue to pay, and then, when the time comes for the insurers to pay what they agreed to pay, allow them to escape their contract on the ground of want of insur-

able interest in the life insured, unless it clearly appears that such contracts are pernicious and dangerous to society.

*Holmes, supra,* 244 N.Y.S.2d at 152.

Regarding Media Texas, the situation is less clear. While it is true that, as a general rule, a corporation has an insurable interest in the life of its key employees, *see* 2 J. Appleman, *supra,* § 872, the district court found that "the record clearly demonstrates that Media Sales (Texas) was nothing more than a nonfunctioning corporate shell." Indeed, no stock was apparently ever issued by Media Texas. The district court also found that "the creation of a Texas corporation was never contemplated by the parties, as evidenced by the representations made by Baum in the application for the life insurance policy."

On appeal, findings of fact will not be reversed absent a showing that they are clearly erroneous. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The evidence shows that, indeed, Baum, Cook, and Cutler at one point contemplated incorporating in Texas, but that on December 19, 1973, Baum instructed his attorney not to incorporate. The next day, Cook, Cutler, and another person formed Media Texas without Baum's knowledge and consent. In fact, Baum stated in his deposition that the Texas incorporation had the effect of cutting him off completely from the venture. Moreover, the articles of incorporation of Media Texas do not list Baum as one of the incorporators of Media Texas. Apparently, attorneys other than the ones Baum or his attorney dealt with in Texas performed the incorporation of Media Texas, and it is fair to conclude that the Texas incorporation envisioned by Baum was different from the actual incorporation that occurred. Finally, the record shows that Cutler was not even aware of the existence of the life insurance policy until after Cook's death.

We consequently cannot say that the district court's findings regarding Baum and his knowledge of Media Texas were clearly erroneous. Indeed, the evidence is clear that Baum paid the original and all subsequent premiums, took out and had possession of the life insurance contract, and sued for the amount of the policy. The district court found that the amendment changing the name of the beneficiary to Media Sales & Marketing, Inc. was made at the insistence of New York Life, and it is clear that New York Life knew that Baum was the real party in interest in the life insurance contract. Moreover, it is clear that Cook, the insured, knew that Baum was to be the designated beneficiary.

## IV. *Conclusion*

For the reasons stated above, the judgment of the district court is reversed with directions that the proceeds from the life insurance policy be paid to Baum.